## SCHOOLCRAFT *v.* SIMPSON.

1. REPLEVIN—DEMAND—SUFFICIENCY.

   The fact that plaintiff in replevin against a sheriff to recover property in his custody under attachment against a third person, on demanding a delivery of the property prior to suit, did not state the nature of his interest, did not invalidate the demand.

2. TITLE TO PERSONALTY—ESTOPPEL.

   Plaintiffs, who furnished the money with which W. bought potatoes, under an agreement that title should be in them until they were reimbursed out of the receipts of sale, were not estopped to set up their title as against an attaching creditor of W., because, before the attachment was levied, but after the debt sought to be collected was incurred, they stated to an agent of the creditor, who assumed the role of a prospective purchaser, that W. owned the potatoes and could give a good title.

Error to Grand Traverse; Mayne, J.   Submitted February 1, 1900.   Decided March 6, 1900.

Replevin by Owen Schoolcraft and Chauncey E. Schoolcraft against Oscar Simpson, sheriff.   From a judgment for plaintiffs, defendant brings error.   Affirmed.

*Pratt & Davis*, for appellant.

*Patchin & Crotser*, for appellees.

MOORE, J. This is an action of replevin. From a judgment in favor of the plaintiffs, the defendant has brought the case here by writ of error.

The Wade Brothers were at one time engaged in buying potatoes. The Armour Refrigerator Car Company had a claim against them of upwards of $400. It sued out a writ of attachment, which writ was placed in the hands of the defendant, who, under the direction of the attorney for the Armour Refrigerator Car Company, who claimed the potatoes belonged to the Wade Brothers, levied upon the potatoes,—about 1,350 bushels, which were in cars 8,182, 4,756, and 4,624 on the railroad track at Traverse City, Mich. The plaintiffs, claiming to be the owners, made a demand upon the sheriff for the potatoes, and, upon his refusal to give them up, replevied them. The plaintiffs are engaged in the grocery business. Prior to the 20th of March, the Wade Brothers had deposited with them some money for the purpose of paying for potatoes which Wade Brothers were to buy. They purchased potatoes either personally or by their agent. The farmer who sold the potatoes was given bills showing the price and quantity of the potatoes he sold. These bills were presented to plaintiffs, and paid from the money belonging to Wade Brothers. About the 20th of March, Wade Brothers got an order for two car loads of potatoes to be sent to Nashville, Tenn. They did not have money enough to buy them. The testimony is conflicting as to whether they had a small amount of money in the hands of the plaintiffs, or had purchased some potatoes with that money. They applied to the plaintiffs for money to enable them to purchase the two car loads of potatoes, when an arrangement was made, which is stated by Mr. Wade as follows:

"I know the property in question, those three cars of potatoes mentioned here. * * * The arrangement un-

der which these potatoes were bought was, I got an order for two cars, and I didn't have money enough to fill them, and I proposed to Schoolcrafts that they should put money enough in to fill the cars out, and hold the potatoes for the money; that is, the potatoes were theirs until I paid them their portion out of it; the potatoes were theirs until they were paid.   I told them that, if there was anything in it, I would allow them a cent and a half a bushel for them; that is, they were to have a cent and a half a bushel.

"*Q*. Well, supposing there was nothing in it, how was it to be as to their getting their money out of it?

"*A*. Why, they had what money we had into them as security for their money.   Their money bought most of these potatoes.   We put some potatoes of our own into the same car.   The arrangement was that the potatoes we purchased ourselves were to belong to them until they were paid.   The potatoes were on the G. R. & I. track in Traverse City.   *   *   *   First began using any of Schoolcraft Brothers' money about the 20th of March.   Never used any of their money before that time.   The arrangement was made in their store, and I think some time along about the 22d of March; but I am not certain.   I had an order from F. J. Loy & Co. for two loads of potatoes, and I didn't have money enough to fill the cars, and it was an order that they wanted me to accept, and potatoes at that time were coming very slow, and I wanted to fill the cars, so as to have them in shape to ship out, and I proposed to these men to help me fill the cars, and they could hold the cars as security for their money; in other words, they could own the potatoes until I shipped the cars.

"The cars were placed on the G. R. & I. track, near the depot, to be loaded.   I think we loaded these potatoes in three or four days.   *   *   *   Potatoes were all put back into the two cars.   Schoolcrafts sold one car and a half, and I sold half a car of them.   The potatoes were loaded into the cars here on the G. R. & I. track.   I ordered the cars placed there.   The cars were out on the track at the time the attachment suit was commenced, were numbered 4,756, 4,624, and 8,182.   At the time the understanding was had with Schoolcrafts, there were two cars that we had orders for, and the understanding was that they were to put in money enough to fill those two cars.   The understanding was that whatever money we lacked they would put in.   *   *   *   The parties of whom

the potatoes were bought had to go to Schoolcrafts to get their money. I had been in the habit of having them go to Schoolcrafts to get their money all winter. That was the place I did my business and had my money deposited. Schoolcraft Brothers always paid out my money as long as I had any there. They paid out all of our money in these two cars,— about $300. They had paid out all money we had on deposit there. I had a right to sell these potatoes subject to their approval. I had no right to sell them without transferring the money over to them. My right to sell them would depend upon whether I transferred the money over to them or put it into my pocket. The idea was just like this: The same as any other man's property you have a right to sell it. I had a right to sell these potatoes, and turn them over the money. * * *

"The numbers of the cars in which the potatoes were loaded were 4,756, 8,182, and, I think, 4,624. Two of these cars were the Armour Refrigerator Car Line Co., and were held under a lease from that company, and they are the plaintiffs in the attachment suit. Two letters show that car number 4,756 was being loaded on the 18th of March. I don't know how long this car had been loading on the 18th of March. Made this arrangement with Schoolcrafts on the 22d of March, and think we had some money on deposit there then. Don't know when it was all paid out. Don't know when Schoolcrafts first began to use their money. I think car number 4,756 was loaded first. It contained about 650 bushels. I don't know how many days we were loading the first car. * * * The potatoes cost from 45 to 48 to 52 cents per bushel. The man I had working for me kept track of what was paid for the potatoes. He marked the prices to be paid on the weigh-bills that were sent over to Schoolcrafts' store. Mr. Dewitt would weigh the potatoes, and turn the weight over to Black, and Black would put down the price. The weigh-bills were taken to Schoolcrafts, and paid, and that is the only way I know how much Schoolcrafts paid. * * * The farmers that sold us these potatoes went to Schoolcrafts, and got their pay, just the same as for the potatoes that we had been buying during the winter. In other words, when we first began to buy potatoes at Traverse City, we made arrangements to leave our money with Schoolcrafts, and they were to pay these checks when they were brought in. I don't remember just when this arrangement was made. We shipped out potatoes from

Traverse City before the 22d of March, and the potatoes in this car had been purchased in the same way. They had been weighed in, and the slips had been sent to Schoolcrafts, and they had paid for the potatoes. * * *

"Now, we had a different arrangement, I think, on these two cars, from any cars that we shipped. We never had any arrangement with Schoolcraft Brothers to advance any money for us before, and I don't think they ever did. I remember having a conversation with Mr. Bryan about these potatoes. He wanted me to turn over two cars, claiming that he had a bill against me of $485. He wanted to know if I could turn over to them two cars to pay his bill. I said, 'No, I can't;' that the potatoes did not belong to me. He wanted to know who he was doing business with,— a nonentity, or wasn't. I told him he was doing business with us all right enough. He wanted to know if I could come down to the hotel, and meet him, at 7 o'clock that night. I told him I would. He said that it had to be settled. I told him I could not settle it, and I went down to go to the hotel before 7 o'clock, and on the way down I went to the cars, to see if they were all right. Mr. Black was with me. I got down there, and the cars had the G. R. & I. locks on. Went up to the hotel, and met Mr. Bryan, and he said that he had attached the cars. These potatoes had been loaded there in the cars from some time in March down to the 4th of April, and had our own locks on. Mr. Black carried the keys, and he was in our employment, and the locks that Mr. Black had the keys to had been taken off, and other locks put on. The car 4,624 was one of the cars attached, and the potatoes that were in that car were transferred from car 8,182, and I don't know when they were put in there."

Other testimony was given to show that the potatoes were to belong to the plaintiffs.

It was the claim of the defendant that plaintiffs simply loaned Wade Brothers money to buy the potatoes, and were not the owners of the potatoes at all, but simply creditors. He also says, giving the most favorable construction possible to the testimony on the part of the plaintiffs, that they own the part only of the potatoes for which their money paid, and attempted to get a lien upon the balance, but did not secure the lien because the possession of the

potatoes was not turned over to them.    The counsel make
the following claim in their brief:

"We submit that the property should have been divided
into three classes:

"1. The potatoes paid for by Schoolcrafts' money, the
title to which was in them, and for which they were enti-
tled to a verdict.

"2. The potatoes bought by Wade Brothers, and placed
in car 8,182, which were paid for with their own money.
As to those, the plaintiffs were only entitled to a verdict
provided they had actually passed into the possession of
plaintiffs.    As they had not, the jury should have been so
instructed, and a verdict for those should have been entered
for defendant.

"3. The potatoes in car 4,756, which were outside of
the agreement, and the court should have so instructed
the jury."

As to the last of these propositions, we do not think the
testimony sustains the contention of counsel.    The jury
were not asked to so find.    There is nothing to indicate in
the record that the judge was of the opinion that plaintiffs
could recover for potatoes that were not within the agree-
ment, or that counsel for plaintiffs so claimed.    The judge
charged the jury as follows:

"Under the evidence in this case, the defendant claims
that, at the time of the replevin, he was holding the prop-
erty in question for the Armour Refrigerator Car Com-
pany herein.    You are instructed, as a matter of law, that
the demand made was such a demand as the law con-
templates.    No more specific demand is required by law
than was given by the attorneys for the plaintiffs.

"If the jury shall find from the evidence that the plain-
tiffs are entitled to recover any of the potatoes in contro-
versy, they must specify the amount of the same, and also
by their verdict, if they find in favor of the defendant,
that they state in said verdict the amount of potatoes
which are to be returned by said plaintiffs to said defend-
ant.

"It will become necessary for the jury to proceed to
ascertain and determine the ownership of the property in
question, in order to ascertain and determine what verdict
they are to render in reference to said property.    You are

therefore instructed that if, at the time of the commencement of this suit, the said plaintiffs were the absolute owners of any part or portion of the property in controversy, as to what part or portion is to be omitted from any verdict which you are to render in this cause. If, however, the jury find from the evidence that a portion of said potatoes belongs to said John A. Wade and Frank D. Wade, then, as to that part or portion of the property, your verdict must be in favor of the defendant and against the plaintiffs for the return of the same; and it is your duty, in rendering said verdict, to specify the amount in bushels of the potatoes belonging to said John A. Wade and Frank D. Wade, and for which you will render a verdict in favor of the defendant.

" If at the time of the commencement of the attachment suit, as well as at the time of the commencement of this replevin suit, you should find that the Schoolcrafts, the plaintiffs, by reason of their agreement with Wade Brothers, were to have the title to all of those potatoes in question, including not only those purchased with their money, but those which Wade Brothers then had on hand, and which they agreed to turn over to the Schoolcrafts; that those potatoes were turned over to the Schoolcrafts, and were intermingled with the potatoes that were purchased with the Schoolcrafts' money; that the Schoolcrafts had the custody and control, together with the right of possession and the possession, of those potatoes, the same as they did of those that were purchased with their own money,—then the plaintiffs in this cause are entitled to recover at your hands. At that time the firm of Wade Brothers and the Schoolcrafts had a right to enter into an agreement of this kind, by which the Schoolcrafts were to advance money, taking the title to these potatoes as a security for the moneys advanced. There is no claim that subsequent to that time—the time of making that agreement—that the Armour Car Line Co. advanced or extended any credit to the firm of Wade Brothers, or that. they were deceived, and acted to their own detriment, in their dealings with the firm of Wade Brothers, by reason of this arrangement with the Schoolcrafts and the firm of Wade Brothers. So I say, if you find that that agreement, as claimed by the plaintiffs, was actually entered into, you should find a verdict for the plaintiffs.

" If you should find that the plaintiffs in this cause extended to the firm of Wade Brothers—that they made

them a loan of this money, dealing with them as they would with others, and taking no security; that they merely advanced them the money,—then they stand exactly in the same position as any other creditor. They would have no claim upon these potatoes in question, and the Armour Car Line Co. would have the right to attach them as against the firm of Wade Brothers, and would have a right to subject these potatoes to their claims as against the plaintiffs in this cause.

"If you find that as to the whole of this property, or to any part of it, that the plaintiffs in this cause only had a special interest in the property, that that special interest was satisfied prior to the commencement of this suit, or that at the present time it only exists as a part of the property, then your verdict should specify the interest which each of the parties has in the property, and you should state the number of bushels to which each is entitled in your verdict. If you find that there was a portion of the property that was purchased with the money of the firm of Wade Brothers, and that that was under an agreement that the firm of Schoolcraft Brothers were to have absolute title to that property, then your verdict should award them such property. If you find that as to that portion of the potatoes which Wade Brothers had and which they owned at the time the money was commenced to be advanced by Schoolcraft Brothers, and which was not purchased by the money of the Schoolcraft Brothers, that it was the agreement and understanding that the Schoolcrafts were to have merely a lien upon that, and not the absolute title and right of possession; and if you find that it was kept separate from the other potatoes purchased by Schoolcrafts' money; that it was not intermingled with them; that Wade Brothers retained all the possession, custody, and control of those potatoes, separate and distinct from the other potatoes,—then that agreement would be void, and the defendant would be entitled to recover at your hands.

"If, on the other hand, you find there was an agreement for a lien upon this property in addition to the title to the other potatoes, and that Wade Brothers placed these potatoes, together with the other potatoes purchased, in those cars; that they were all intermingled; and that the right, custody, and control of those potatoes were all alike,—were all in the Schoolcrafts,—then the Schoolcrafts have the right to retain the whole until they obtain

their money, and they have a right to recover a verdict at your hands.

"If you should find further that they were joint owners, that each had an undivided interest, then your verdict should be for the defendant, because one joint owner cannot bring an action of replevin against his joint owner; and in this case the other joint owner would be represented by the sheriff.

"My attention was called by the requests of both these parties to the testimony of this agent, Mr. William E. Bryan. If you find from his testimony that he went to the store of the Schoolcrafts, and represented to them that he wanted to purchase these potatoes, and asked if a perfect title could be obtained in case he did purchase them, and, further, that the Schoolcrafts said that that was so,— that he could get title provided he purchased them,—that statement, made by the Schoolcrafts in that connection, would not estop them from now coming in and maintaining title to these goods, for the reason that they had a right at the time to answer the question as it was asked, believing that, if the firm of Wade Brothers sold and conveyed title to him, that they would get their money out of it by reason of such sale. If the Armour Car Line Co. were here as purchasers relying on that statement, they would be in an entirely different position from what they are in as attaching creditors, inasmuch as the testimony does not show that they extended the credit for which the attachment suit was brought by reason of having been misled, or relying upon the statements made by Schoolcraft Brothers."

It is claimed the court erred in saying the demand made by the plaintiffs to the sheriff for a return of the property was sufficient. Counsel say the demand should have given defendant notice of what plaintiffs claimed; for the reason that the sheriff could not tell what to do until he was informed of the plaintiffs' claim; counsel citing *Campbell* v. *Quackenbush*, 33 Mich. 287, and a number of other Michigan cases. A reference to these cases shows that they were all replevin cases, in some of which no demand was made before bringing suit, and it was held that in the several cases a demand was necessary; but none of them indicate that the demand made in this case was not sufficient.

Counsel insist the court erred in his charge to the jury

as to the effect of the conversation had between Mr. Schoolcraft and the attorney for the plaintiff in the attachment suit before the attachment suit was commenced. The witnesses do not agree in relation to that conversation. It does appear, however, that, before this conversation, the attorney had been informed by Mr. Wade that Wade Brothers did not own the potatoes. According to the testimony of the attorney, he appeared before Mr. Schoolcraft in the character of a buyer.

"I asked him if I should buy these three cars of potatoes on the track from Wade Brothers, if I would be able to get a good title to them; if Wade Brothers owned the potatoes, and if they were paid for. He said, 'Yes, they are Wade Brothers' potatoes;' and he also said that, if I would buy them, I would get a good title."

On the cross-examination he testified:

"Their answer was I was all right; go ahead and buy the potatoes; that Wade Brothers owned them; that they were all paid for. Of course, they said, they might owe a dollar or so to the farmers, but, so far as that is concerned, they owe us $275 or $300, money loaned them to buy these potatoes."

Mr. Schoolcraft says Mr. Bryan "wanted to know if Wades owned these potatoes,— had a right to give title to them; but I didn't state it as Mr. Bryan says,— that we had loaned Wade Brothers $300. I did tell Mr. Bryan that Wade Brothers could give a good title after they had paid us." Mr. Bryan was not frank with the plaintiffs. He did not ask them if Wade Brothers had an interest in the potatoes which he could attach, but gave them the impression he wanted to buy the potatoes. Of course, the potatoes were for sale. They were bought to be sold again, and Mr. Schoolcraft might well say a buyer would get a good title, for it was expected the plaintiffs would be paid out of the proceeds of the sale.

The claims of the respective parties were conflicting. Each produced such testimony as it could in support of its claims. The case was fairly submitted to the jury. Judgment is affirmed.

The other Justices concurred.